**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

FEDERAL DEPOSIT INSURANCE CORPORATION
AS RECEIVER FOR GUARANTY BANK

            Plaintiff,

   -against-

CITIBANK N.A.,

            Defendant.

---------------------------------------------------------------x

Index No. 15-cv-6574

**COMPLAINT**

**DEMAND FOR JURY
TRIAL**

## TABLE OF CONTENTS

**Page**

NATURE OF ACTION .................................................................................................1

PARTIES ....................................................................................................................7

JURISDICTION AND VENUE ......................................................................................7

FACTUAL ALLEGATIONS ..........................................................................................8

I.  THE SECURITIZATION PROCESS....................................................................8

II.  CITIBANK'S DUTIES AND OBLIGATIONS .....................................................10

   A.  Citibank's Duties Pertaining to the Delivery of Mortgage Files ..............10

   B.  Citibank Had a Duty to Provide Notice of Defaults and
       Enforce Repurchase Obligations Triggered by Such Notice ...................13

   C.  Citibank Had a Duty to Act
       Prudently to Enforce Repurchase Obligations..........................................15

   D.  Citibank Had a Duty to Address the
       Servicer's Failure to Meet Prudent Servicing Standards ..........................16

III.  CITIBANK BREACHED ITS
      CONTRACTUAL AND STATUTORY DUTIES ...............................................17

   A.  Citibank Failed to Take Possession of Complete Mortgage Files ............17

   B.  Citibank Was Aware of but Failed to
       Provide Notice of Sponsor's and Originator's
       Pervasive Representation and Warranty Breaches ...................................19

       1.  Citibank Obtained Information During
           Its Administration of RMBS Trusts Alerting
           It to Widespread Breaches of Representations and Warranties ......21

       2.  Citibank Was Aware of Rating
           Downgrades and High Level of Defaults ........................................23

       3.  Citibank Was or Should Have Been Aware of
           the Originator's and Sponsor's Pervasive Breaches........................24

4.   If Citibank Had Performed Its Duties,
It Would Have Obtained Further Evidence
of Breaches of Representations and Warranties ............................26

C.   Citibank Failed to Act Prudently to Enforce Repurchase Obligations ......27

1.   Events of Default Relating to Document Delivery ......................28

2.   Events of Default Concerning False
Master Servicer and Servicer Certifications .................................29

D.   Citibank Failed to Address the
Master Servicer's and Servicer's Excessive
Charges for Default Services that Diminished Trust Assets....................31

IV.   CITIBANK'S CONDUCT INJURED PLAINTIFF ...............................................32

CAUSES OF ACTION ...............................................................................................35

FIRST CAUSE OF ACTION
(Breach of Contract) .................................................................................................35

SECOND CAUSE OF ACTION
(Violation of the Streit Act) ....................................................................................36

THIRD CAUSE OF ACTION
(Violations of the TIA) .............................................................................................37

PRAYER FOR RELIEF ..............................................................................................40

JURY TRIAL DEMANDED .......................................................................................41

Plaintiff Federal Deposit Insurance Corporation as Receiver for Guaranty Bank ("Plaintiff" or "FDIC-R"), by and through its attorneys, brings this action against Defendant Citibank N.A. ("Citibank," "Defendant," or the "Trustee"), and alleges as follows:

## NATURE OF ACTION

1.      This is an action for damages against Citibank for its breaches of contractual and statutory duties under the governing agreements, the New York Streit Act, N.Y. Real Property Law § 124, *et seq.* (the "Streit Act"), and under the federal Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. § 77aaa, *et seq.*[1] as Trustee for Structured Asset Mortgage Investments II Trust 2007-AR6 Mortgage Pass-Through Certificates ("SAMI 2007-AR6" or the "Covered Trust") securitization trust, which issued residential mortgage-back securities ("RMBS") purchased by investors, including Guaranty Bank ("Guaranty").

2.      This action seeks to hold Citibank accountable for abdicating its fundamental duties as the trustee for certificateholders such as Plaintiff.  Under the agreements governing the Covered Trust, Citibank accepted virtually all of the powers designed to protect the certificateholders and was compensated for that role.  Citibank was essentially Plaintiff's sole source of protection against breaches of the governing agreements by the other parties to those agreements, including the sponsor that sold the loans to the Covered Trust and the servicers tasked with servicing the mortgage loans.  Citibank, however, shirked its duty to exercise its powers to protect Plaintiff and instead attempted to shorn itself of the responsibilities that trusteeship imports.  While Citibank stood idly for years, the sponsor kept defective mortgage loans in the Covered Trust, servicers reaped excessive fees for servicing the defaulted loans from

---

[1] Plaintiff acknowledges that the United States Court of Appeals for the Second Circuit has held that the TIA does not apply to RMBS similar to the RMBS at issue here.  Plaintiff includes a claim under the TIA to the extent there are any further developments in the law and for purposes of preserving any rights on appeal.

the Covered Trust, and Plaintiff was left to suffer enormous losses.

3.       The Covered Trust was sponsored by EMC Mortgage Corporation ("EMC" or the "Sponsor") and backed by loans originated by American Home Mortgage Corp. ("AHM" or the "Originator").

4.       Prior to its failure, Guaranty purchased the RMBS certificate SAMI 2007-AR6 1A2 with an original face value of $420,046,000 (the "Certificate") as set forth below:

| Deal Name | CUSIP | Tranche | Purchase Date | Purchase Price |
|---|---|---|---|---|
| SAMI 2007-AR6 | 86364RAB5 | 1A2 | Oct. 31, 2007 | $420,046,000 |

5.       The Certificate represents interests in the cash flows associated with the mortgage loans deposited into the Covered Trust by the Sponsor and its affiliates or business partners.  The certificateholders are the beneficiaries of the Covered Trust.  The quality of the mortgage loans deposited into the Covered Trust is critical, and numerous provisions of the governing agreements assure that only qualifying loans would be deposited into the Covered Trust.  Similarly, because the securities were to be "mortgage-backed," numerous other provisions seek to assure that complete documentation for each loan, including an original mortgage note and a properly assigned mortgage, would be delivered to Citibank.

6.       The certificateholders, however, did not receive any loan or mortgage files that they could check to make certain that their contractual rights were being protected.  Rather, such investors were dependent upon their trustee representative, Citibank, to protect their contractual and other legal rights.

7.       As the Trustee for the Covered Trust, Citibank owed investors, like Plaintiff, certain contractual duties, as well as duties under the Streit Act and the TIA, with respect to mortgage loans owned by the Covered Trust.  Among these duties are those set forth in the

governing agreement, the pooling and servicing agreement ("PSA"), which was incorporated by reference into the certificates that Citibank signed, and under applicable state and federal laws.

8.      Sponsors and Citibank typically had extensive business relationships. Nevertheless, as trustee, Citibank was obligated to act against the financial interest of the Sponsor when demanded by the circumstances.  The contractual right to have the Sponsor replace or repurchase defective mortgage loans and the duties of Citibank to enforce such obligations and the other rights of investors in the Covered Trust was a significant protection received by investors in the Covered Trust.  Citibank, however, failed in its obligations and breached its contractual and statutory obligations to protect the rights of investors such as Plaintiff.  As a result, Plaintiff has suffered material damages, which it seeks to recover in this action.

9.      Citibank breached its contractual and statutory duties in at least four different ways that caused Plaintiff to suffer damages.

10.     First, to ensure that the rights, title, and interest in the mortgage loans were perfected and properly conveyed to Citibank, the PSA imposed on Citibank a duty to ensure that key documents for the loans were included in the mortgage files and to create an exception report identifying incomplete mortgage loan files.  Citibank, however, systematically disregarded these contractual and statutory duties to enforce these rights on behalf of certificateholders.  If Citibank had met its contractual and statutory duties with respect to the non-complaint loans whose defects were not cured during the limited cure period, the Sponsor (or other obligated party) would have been required to substitute compliant loans for the loans with incomplete files, or repurchase the loans instead of having them remain in the Covered Trust causing Plaintiff to incur significant losses.

11.    Second, Citibank had important notice obligations under the PSA.  Upon discovery of any breach of the mortgage loan representations and warranties that materially and adversely affects the interests of certificateholders, Citibank was required to notify all the parties to the PSA of the breach, triggering the obligated party's duty to either cure the defect within the cure period or substitute or repurchase the loans.  Citibank failed to provide such notices.  If adequate notice of such breaches had been provided, the obligated parties would have been required to cure the breaches or repurchase the mortgage loans that did not comply with the applicable underwriting guidelines, and that ultimately caused a significant portion of Plaintiff's losses.  Citibank knew, or should have known, of the representation and warranty breaches and, thus, breached its obligation to provide notice.  Additionally, Citibank was obligated to notify the mortgage loan servicers when the servicers breached the PSA, triggering the servicers' obligation to cure the breach.  Citibank failed to do so.  Finally, Citibank failed to provide certificateholders notice, as required under the PSA, of any Event of Default.

12.    Third, upon occurrence of an Event of Default, as defined under the PSA, Citibank had a contractual and statutory duty to act prudently and exercise available remedies to protect the interests of certificateholders.  Having notice of the servicers' numerous defaults and Events of Default under the PSA and breaches of the mortgage loan representations and warranties, Citibank should have prudently exercised all available remedies to ensure that certificateholders were adequately compensated.  If Citibank had acted prudently, it would have issued repurchase demands years ago and, if necessary, commenced litigation forcing the Sponsor (or other obligated party) to repurchase defective loans or pay for losses.

13.   <u>Fourth</u>, the PSA required Citibank to take steps to protect Plaintiff whenever it became aware of uncured loan servicing failures by the Covered Trust's servicers.  The servicer for the Covered Trust was EMC Mortgage Corporation (the "Servicer") and the master servicer was Wells Fargo Bank, N.A. (the "Master Servicer" or "Securities Administrator").  The servicers were supposed to ensure the proper servicing and administration of the mortgage loans in the Covered Trust for the benefit of the certificateholders.  The PSA required the servicers (and their subservicers) to exercise customary and "prudent" loan servicing practices in servicing the mortgage loans.  The servicers failed to meet prudent servicing standards because, among other things, they regularly overcharged for various default services provided in connection with the mortgage loans and they failed to: (i) promptly collect payments from borrowers and remit them to the Covered Trust; (ii) promptly send delinquency notices to borrowers who were late on their payments; (iii) ensure the proper maintenance and reporting of accurate information regarding the mortgage loans; (iv) ensure the proper and prudent modification of mortgage loans when necessary; and (v) ensure the proper, prudent, correct, and truthful institution and prosecution of foreclosure proceedings they failed to prudently perform loss mitigation procedures.  The excessive fees ultimately were paid out of the Covered Trust.  Citibank failed to take steps to address these defaults, which damaged Plaintiff by increasing the loss severities for defaulted loans.

14.   Citibank's breaches of these duties give rise to three distinct legal claims.

15.   <u>Breach of Contract</u>.  Citibank breached the PSA by failing to: (i) provide notice of the mortgage loan representation and warranty violations; (ii) provide notice of the servicers' failure to give notice of those same representation and warranty violations; (iii)

cause the responsible parties to repurchase or substitute loans that were subject to a breach of representation or warranty or missing documentation required to be delivered under the PSA; and (iv) exercise all rights and remedies available to the Trustee under the PSA upon the occurrence of an Event of Default.

16.     <u>Violation of the Streit Act</u>.  Citibank violated the Streit Act by failing to "use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs" to protect the rights of certificateholders during the pendency of an "event of default."  The Streit Act applies to the extent a PSA is not "qualified" under the TIA.

17.     <u>Violation of the TIA</u>.  The TIA requires the trustee to provide certificateholders with notice of defaults under the operative indentures within 90 days of becoming aware of such defaults and to act prudently to protect the rights of certificateholders during the period in which the default remains uncured.  Citibank violated these provisions by failing to provide notice of defaults it was aware of and failing to act prudently to protect the certificateholders' interests by exercising all rights and remedies available to them under the PSA.

18.     By failing to perform these duties, Citibank has caused Plaintiff to suffer significant damages.  Plaintiff incurred these damages both before and in March 2010 when it sold the Certificate as part of a resecuritization transaction, Structured Sale of Guaranteed Notes 2010-S1 ("SSGN 2010-S1"), and suffered significant losses caused by Citibank's breaches of duties it owed Plaintiff.

## PARTIES

19.     Plaintiff, FDIC-R, is the receiver for Guaranty Bank, Austin, Texas.  The Federal Deposit Insurance Corporation ("FDIC") is a corporation organized and existing under the laws of the United States of America.  Under the Federal Deposit Insurance Act, the FDIC is authorized to be appointed as receiver for failed insured depository institutions.  On August 21, 2009, Guaranty Bank was closed by the Office of Thrift Supervision and the FDIC was duly appointed as the receiver for Guaranty Bank.  Under the Federal Deposit Insurance Act, the FDIC as receiver succeeds to, and is empowered to use and complain in any court of law to pursue, all claims held by any bank for which it is the receiver.  12 U.S.C. §§ 1819, 1821(d)(2)(A)(i).  Thus, the FDIC as receiver for Guaranty Bank has authority to pursue claims formerly held by Guaranty Bank, including the claims made against the Defendant in this action.

20.     Defendant Citibank is a national banking association.  It is a wholly-owned subsidiary of Citigroup, Inc., a Delaware corporation.  Citibank's principal executive offices are located at 399 Park Avenue, Front 1, New York, NY 10043.  It served as the trustee for the Covered Trust during all relevant time periods.[2]  For the Covered Trust, Citibank signed the Certificates incorporating the PSA.  As the trustee for the Covered Trust, Citibank owed certificateholders certain statutory and contractual duties with respect to the mortgage loans owned by the Covered Trust, which it violated.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action pursuant to 12 U.S.C. § 1811 *et seq.*, 12 USC § 1819 (b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345.  12 U.S.C. § 1819(b)(2)(A) provides that all suits to which the FDIC, in any capacity, is a party shall

---

[2] Citibank resigned as trustee for the Covered Trust in or around December 2012, after Plaintiff re-securitized the Certificate and suffered damages as described below.

be deemed to arise under the laws of the United States.

22.     Venue is proper pursuant to 28 U.S.C. § 1391(b) as Citibank resides and transacts business in this District and a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this District.

23.     This Court has personal jurisdiction over Citibank because Citibank maintains its principal place of business in New York and a substantial part of the administration of the Covered Trust, out of which the claims asserted herein arise, is performed in New York.

## FACTUAL ALLEGATIONS

## I.     THE SECURITIZATION PROCESS

24.     The process through which RMBS are created and sold is known as mortgage loan securitization.  In broad terms, mortgage loans are acquired from mortgage originators and pooled together in a trust, which issues securities representing interests in the cash flow from principal and interest payments on the pool of loans after certain costs and fees are deducted.

25.     The first step in each securitization is generally the acquisition of mortgage loans by a sponsor (or "seller"), such as EMC, and the sale of a large pool of such loans by the sponsor to a depositor, typically a special-purpose affiliate of the sponsor.

26.     The depositor then conveys the pool of loans to a trustee, such as Citibank, pursuant to a PSA.  Each securitization includes various prioritized "tranches" of interests in payments to be made by borrowers on the loans.  The trust issues certificates representing those tranches; the certificates are sold to an underwriter; and the underwriter re-sells the certificates at a profit to investors.  The sponsor (through its affiliated depositor) earns a profit on the excess of the proceeds of the sale of certificates to the underwriter over the cost

of purchasing the mortgage loans.  Here, Citibank acted as the trustee in connection with the relevant RMBS transaction.

27.     Pursuant to the PSA, a "servicer" is obligated to manage the collection of payments on the mortgage loans in return for a monthly fee.  The servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation, and managing and selling foreclosed properties.

28.     For the Covered Trust, the Securities Administrator delivers monthly remittance reports to holders of certificates describing the performance of underlying loans and compliance with the PSA.  For trusts created in 2006 and later such as the Covered Trust, the contents of those reports are specified in the PSA and in Item 1121 of SEC Regulation AB.  *See* 17 C.F.R. § 229.1121.

29.     Each tranche in a loan securitization has a different level of risk and reward, and its own rating issued by a nationally recognized credit-rating agency such as Standard & Poor's or Moody's.  The most senior tranches generally receive the highest ratings.  Junior tranches receive lower ratings, but offer higher potential returns.  Senior tranches are generally entitled to payment in full ahead of junior tranches, and shortfalls in principal and interest payments are generally allocated first to junior tranches.  This division of cash flows and losses is referred to as the "waterfall."

30.     Because the cash flow from payments made by mortgage borrowers on the underlying mortgage loans is the sole source of funds to pay holders of a mortgage-backed security, the credit quality of the security turns on the credit quality of, and the trust assets securing, the underlying loans, which often number in the thousands.

31.    Citibank earned various forms of compensation in connection with its role as trustee, including typically an annual fee based on the percentage of principal outstanding on the loans underlying the RMBS.  The RMBS trustee engagements further deepened Citibank's business relationships with the sponsors and underwriters of the RMBS, leading to more lucrative future engagements.

## II.    CITIBANK'S DUTIES AND OBLIGATIONS

32.    Citibank's duties and obligations as the trustee for the Covered Trust are spelled out in the PSA.  This agreement governs the parties' respective rights and responsibilities in connection with the Covered Trust.  Citibank entered into the PSA with (i) Structured Asset Mortgage Investments II Inc., as depositor; (ii) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator; and (iii) EMC Mortgage Corporation, as Sponsor.

### A.    Citibank's Duties Pertaining to the Delivery of Mortgage Files

33.    The PSA sets forth a process for conveying the mortgage loans to the Covered Trust.  Typically, the Sponsor conveyed the loans to the depositor for the Covered Trust. Then the depositor conveyed the mortgage loans to Citibank in its capacity as the trustee for the Covered Trust to hold for the benefit of the certificateholders.  This process is set forth in Section 2.01 of the PSA, which provides in relevant part:

> (a) The Depositor, concurrently with the execution and delivery of this Agreement, sells, transfers and assigns to the Trust without recourse all its right, title and interest in and to (i) the Mortgage Loans identified in the Mortgage Loan Schedule, and the related Mortgage Notes, mortgages and other related documents, including all interest and principal due with respect to the Initial Mortgage Loans after the Cut-off Date and with respect to the Subsequent Mortgage Loans after the related Subsequent Cut-off Date, but excluding any payments of principal and interest due on or prior to the Cut-off Date (with

10

respect to the Initial Mortgage Loans), and the related Subsequent Cut-off Date (with respect to the applicable Subsequent Mortgage Loans) . . . (v) the Required Insurance Policies and any amounts paid or payable by the related insurer under any Insurance Policy (to the extent the related mortgagee has a claim thereto), (vi) the Mortgage Loan Purchase Agreement and each Subsequent Mortgage Loan Purchase Agreement to the extent provided in Subsection 2.03(a), (vii) the rights with respect to the Servicing Agreement as assigned to the Trustee on behalf of the Certificateholders by the Assignment Agreement, and (viii) any proceeds of the foregoing.

34.    In addition, Section 2.02 of the PSA provides that Citibank, or the document custodian on its behalf, is required to take physical possession of the mortgage loans and the accompanying mortgage files for the exclusive use and benefit of all current and future certificateholders:

(a) The Trustee acknowledges the sale, transfer and assignment of the Trust Fund to it by the Depositor and receipt of, subject to further review and the exceptions which may be noted pursuant to the procedures described below, and declares that the Custodian on its behalf holds, the documents (or certified copies thereof) delivered to it pursuant to Section 2.01, and declares that it will continue to so hold those documents and any amendments, replacements or supplements thereto and all other assets of the Trust Fund delivered to it as Trustee in trust for the use and benefit of all present and future Holders of the Certificates. On the Closing Date, with respect to the Initial Mortgage Loans, and on the related Subsequent Transfer Date, with respect to the Subsequent Mortgage Loans, the Custodian shall acknowledge, with respect to each Mortgage Loan by an Initial Certification substantially in the form of Exhibit One to the Custodial Agreement, receipt of the Mortgage File, but without review of such Mortgage File, except to the extent necessary to confirm that such Mortgage File contains the related Mortgage Note or a lost note affidavit in lieu thereof.

35.    Section 2.01(b) of the PSA also specifically sets forth the operative documents that must be contained in the mortgage file for the mortgage loans, including, but not limited to, the original mortgage note or certified copy thereof, a duly executed

assignment of the mortgage together with any interim assignments of the mortgage, and the lender's title policy.

36.     Physical possession of these documents by Citibank, or a document custodian on its behalf, was necessary to transfer the ownership rights to the mortgage loans from the Sponsor and depositor to the Covered Trust.

37.     After a designated period, Citibank, or a document custodian as agent for Citibank, was required to issue a final certification and attached document exception report. The final certification and document exception report are the two key certifications that Citibank was required to prepare for the Covered Trust.  In these documents Citibank certified that: (i) there was full and complete loan documentation in accordance with the requirements of the PSA for those loans specifically identified on the mortgage loan schedule; and (ii) Citibank had not obtained complete required documentation for those loans identified on the document exception report.  *See* PSA § 2.02(b).  The form of final certification was attached to the PSA as Exhibit 3.

38.     If there was a defect with any mortgage file, then Citibank was obligated to demand that the Sponsor cure the defect leading to the exception within 90 days or repurchase or substitute the defective loans.  This is set forth in Section 2.02(b) of the PSA, which provides:

> *In conducting such review, the Trustee or the Custodian, on behalf of the Trustee, will ascertain whether an original of each document required to be recorded has been returned from the recording office with evidence of recording thereon or a certified copy has been obtained from the recording office.* If the Trustee or the Custodian, on behalf of the Trustee, finds any document constituting part of the Mortgage File has not been received, or to be unrelated, determined on the basis of the Mortgagor name, original principal balance and loan number, to the Mortgage Loans identified on Exhibit B, or to appear

defective on its face, the Trustee or the Custodian, on behalf of the Trustee, shall upon completion of the review of all the Mortgage Files, but in no event later than 180 days from the Closing Date, notify the Sponsor (provided, however, that with respect to those documents described in subsection (b)(iv), (b)(v) and (b)(vii) of Section 2.01, the Trustee's and the Custodian's obligations shall extend only to the documents actually delivered to the Trustee or the Custodian pursuant to such subsections). ***In accordance with the Mortgage Loan Purchase Agreement, or the related Subsequent Mortgage Loan Purchase Agreement, with respect to the related Subsequent Mortgage Loans, the Sponsor shall correct or cure any such defect*** or EMC shall deliver to the Trustee an Opinion of Counsel to the effect that such defect does not materially or adversely affect the interests of Certificateholders in such Mortgage Loan within 90 days from the date of notice from the Trustee of the defect and if the Sponsor is unable to cure such defect within such period, and if such defect materially and adversely affects the interests of the Certificateholders in the related Mortgage Loan, ***then the Trustee shall enforce the Sponsor's obligation under the Mortgage Loan Purchase Agreement (or the related Subsequent Mortgage Loan Purchase Agreement, with respect to the Subsequent Mortgage Loans) to, within 90 days from the Trustee's or the Custodian's notification, provide a Substitute Mortgage Loan (if within two years of the Closing Date) or purchase such Mortgage Loan at the Repurchase Price***. . . .

(Emphasis added.)

> ### B. Citibank Had a Duty to Provide Notice of Defaults and Enforce Repurchase Obligations Triggered by Such Notice

39. As a party to the PSA, Citibank had an obligation pursuant to the PSA to provide notice to all parties of the other parties' breaches of representations and warranties under the PSA.  For example, Section 2.03(b) of the PSA provides:

> If the Depositor, the Securities Administrator or the Trustee discovers a breach of any of the representations and warranties set forth in the Mortgage Loan Purchase Agreement (or a Subsequent Mortgage Loan Purchase Agreement), which breach materially and adversely affects the value of the interests of Certificateholders or the Trustee in the related Mortgage Loan, the party discovering the breach shall give prompt written notice of the breach to the other parties. . . .

40.     The PSA requires that Citibank provide notice to the Master Servicer of breaches of representations and warranties or covenants.  Section 8.01(ii) of the PSA provides that most breaches by the Master Servicer ripen into an Event of Default if left unremedied for sixty days after "the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Master Servicer by the Trustee. . . ." This provision clearly contemplates that the Citibank "shall" provide notice of Master Servicer breaches upon becoming aware of such breaches, which makes sense as the Trustee was the party required to police the deal for investors.

41.     Under Section 8.04 of the PSA, "[t]he Trustee shall transmit by mail to all Certificateholders, within 60 days after the occurrence of any Event of Default known to the Trustee, unless such Event of Default shall have been cured, notice of each such Event of Default hereunder known to the Trustee."

42.     Additionally, Congress enacted the TIA to ensure, among other things, that investors in certificates, bonds, and similar instruments, have adequate rights against, and receive adequate performance from, the responsible trustees. 15 U.S.C. § 77bbb.

43.     Under Section 315(b) of the TIA, Citibank was required to give certificateholders notice of a default under the PSA within ninety days of learning of such default.  15 U.S.C. § 77ooo(b).

44.     As set forth in Section III below, Citibank failed to give notice of numerous defaults and breaches of representations and warranties or covenants as required under the PSA, common law, and the TIA.

14

### C.     Citibank Had a Duty to Act Prudently to Enforce Repurchase Obligations

45.     Under the PSA, the Streit Act, and the TIA, Citibank owed a duty to certificateholders upon the occurrence of an Event of Default.  Citibank's post-default contractual duty is described in Section 9.01 of the PSA, which provides in relevant part, "[i]f an Event of Default has occurred . . . the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and . . . use the same degree of care and skill in their exercise, as a prudent person would exercise under the circumstances in the conduct of his own affairs."

46.     The Streit Act provides that upon the occurrence of an "Event of Default," as that term is defined in the trust indenture, an indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.  The Streit Act also requires trustees to avoid conflicts of interest.[3]

47.     A prudent trustee would have taken appropriate steps to ensure all mortgage loan documentation was completely and accurately transferred to the trusts.  A prudent trustee also would have ensured that the appropriate parties were receiving notification of breaches of representations and warranties from servicers and master servicers and enforced the responsible parties' obligations with respect to breaching mortgage loans.  As set forth in Section III below, Citibank failed to exercise its duties both prior to and after the occurrence of defaults and

---

[3] In addition, Section 315(c) of the TIA provides that upon the occurrence of a "default" the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.  15 U.S.C. § 77ooo(c).

15

Events of Default.

**D.    Citibank Had a Duty to Address the**
**Servicer's Failure to Meet Prudent Servicing Standards**

48.    The PSA requires the Master Servicer or Servicer to service the loans

underlying the Covered Trust prudently.

49.    Section 3.01 of the PSA provides:  "The Master Servicer shall . . . supervise,

monitor and oversee the obligation of the Servicer to service and administer their respective

Mortgage Loans with the terms of the Servicing Agreement . . . the Master Servicer shall act

in a manner consistent with Accepted Master Servicing Practices".  "Accepted Master

Servicing Practices" are defined as: "With respect to any Mortgage Loan, as applicable, those

customary mortgage master servicing practices of prudent institutions that master service

mortgage loans of the same type and quality as such mortgage loan in the jurisdiction where the

related Mortgaged Property is located, to the extent applicable to the Trustee or the Master

Servicer (except in its capacity as successor to the Servicer)."  PSA § 1.01.  Further, Section

3.03 (b) provides: "The Master Servicer, for the benefit of the Trustee and the

Certificateholders, shall enforce the obligations of the Servicer under the Servicing

Agreement."

50.    The PSA provides that failure to meet prudent servicing standards is an Event

of Default if left uncured for 60 days after notice of the default.  *See* PSA § 8.01(ii).

51.    Upon a servicer default or Event of Default, the Trustee was obligated to act.

As discussed above in Section II(B), Citibank had a duty to provide notice when it became

aware of breaches of the PSA by the Servicer or the Master Servicer.  If the defaults were

not cured within the grace period, the Trustee was required to take action to address the

defaults.  Further, the Trustee cannot avoid its duties after the grace period because it failed

16

to give the required notice of defaults.  For example, the PSA provides that once an Event of Default occurred, the Trustee had the authority and obligation to "terminate all of the rights and obligations (but not the liabilities) of the Master Servicer," PSA § 8.01, and "become successor in all respects to the Master Servicer in its capacity under this Agreement."  PSA § 8.02.  More generally, Citibank, as trustee, had a duty to exercise all rights available under the PSA to protect certificateholders' interests and do so prudently.

52.     As set forth in Section III below, Citibank breached its contractual duties by failing to take actions to address the servicer defaults and Events of Default.

## III.     CITIBANK BREACHED ITS CONTRACTUAL AND STATUTORY DUTIES

### A.     Citibank Failed to Take Possession of Complete Mortgage Files

53.     Citibank breached its contractual duties under the PSA by failing to cause the Sponsor to repurchase or substitute for loans that, based on information and belief, were listed on final exception reports with defects, but were not cured within the required period.

54.     Citibank's failure was not a mere technicality, as explained by Georgetown Law School Professor Adam Levitin in his testimony before the House Financial Services Committee in November 2010.  Professor Levitin described the implications of the failure by a securitization trustee such as Citibank to take physical possession of the key documents in the loan file:

> If mortgages were not properly transferred in the securitization process, then mortgage-backed securities would in fact not be backed by any mortgages whatsoever.  The chain of title concerns stem from transactions that make assumptions about the resolution of unsettled law.  If those legal issues are resolved differently, then there would be a failure of the transfer of mortgages into securitization trusts.

*       *       *

17

> Recently, arguments have been raised in foreclosure litigation about whether the notes and mortgages were in fact properly transferred to the securitization trusts. This is a critical issue because the trust has standing to foreclose if, and only if, it is the mortgagee. If the notes and mortgages were not transferred to the trust, then the trust lacks standing to foreclose.
>
> *       *       *
>
> If the notes and mortgages were not properly transferred to the trusts, then the mortgage-backed securities that the investors purchased were in fact non-mortgage-backed securities. In such a case, investors would have a claim for the rescission of the MBS, meaning that the securitization would be unwound, with investors receiving back their original payments at par (possibly with interest at the judgment rate). Rescission would mean that the securitization sponsor would have the notes and mortgages on its books, meaning that the losses on the loans would be the securitization sponsor's, not the MBS investors.

*Problems in Mortgage Servicing from Modification to Foreclosure: Before S. Comm. on Banking, Housing, and Urban Affairs* (2010) (statement of Adam Levitin, Associate Professor of Law, Georgetown University Law Center).

55.     It would have been obvious to a reasonably competent trustee performing its contractual duties with due care that, for example, the original mortgage note was missing from the loan file, or there was a missing link in the chain of endorsements from the mortgage loan originator to Citibank, or there was no duly executed assignment of the mortgage to Citibank, or the original lender's title policy was missing. In many cases, Citibank likely identified these obvious defects and noted them on the final exception reports for the Covered Trust, but, upon information and belief, it did not require that they be corrected.[4]

56.     Based on information and belief, Citibank knew or should have known of

---

[4] To the extent Citibank failed to properly list required documentation exceptions on the final exception reports, that failure would be an additional breach of its duties under the PSA.

numerous instances where it did not receive the original mortgage note with all intervening

endorsements that showed a complete chain of endorsement from the Originator to the

Sponsor or depositor or a lost mortgage note affidavit, as well as a duly executed assignment

of mortgage for each loan that was not a MERS loan, the original recorded mortgage for

each loan that was not a MERS loan, the original mortgage for those loans that were MERS

loans, or the original recorded assignment or assignment of the mortgage together with all

interim recorded assignments and the original lender's title policy.  When those defects were

left uncured after the expiration of the contractual cure period, a prudent trustee would have,

at a minimum, sought repurchase of all defaulted loans with incomplete mortgage files.

**B.    Citibank Was Aware of but Failed to Provide Notice of Sponsor's and Originator's Pervasive Representation and Warranty Breaches**

57.    Citibank failed to give notice of breaches of representations and warranties

provided by the Sponsor, EMC, concerning the mortgage loans backing the Covered Trust.

58.    EMC represented and warranted in the PSA that "each Mortgage Loan was

originated in accordance with the underwriting guidelines of the related originator."  EMC

PSA Ex. J, § 7.  EMC further represented and warranted the following:

> (i) the information set forth in the Mortgage Loan Schedule hereto is true and correct in all material respects;
>
> (ii) as of the Cut-off Date, (a) not more than 1.38% of the outstanding principal balance of the Mortgage Loans are 30 days Delinquent in payment of principal and interest and (b) none of the Mortgage Loans are 60 or more days Delinquent in payment of principal and interest;
>
> (iii) immediately prior to the transfer to the Purchaser, the Mortgage Loan Seller was the sole owner of beneficial title and holder of each Mortgage and Mortgage Note relating to the Mortgage Loans and is conveying the same free and clear of any and all liens, claims, encumbrances, participation interests, equities, pledges, charges or security interests of any nature and the Mortgage Loan Seller has

full right and authority to sell or assign the same pursuant to this Agreement . . .

(viii) each Mortgage is a valid and enforceable first lien on the property securing the related Mortgage Note . . .

(xiv) a lender's title insurance policy (on an ALTA or CLTA form) or binder, or other assurance of title customary in the relevant jurisdiction therefor in a form acceptable to Fannie Mae or Freddie Mac, was issued on the date that each Mortgage Loan was created by a title insurance company which was qualified to do business in the jurisdiction where the related Mortgaged Property is located, insuring the Mortgage Loan Seller and its successors and assigns that the Mortgage is a first priority lien on the related Mortgaged Property in the original principal amount of the Mortgage Loan; and the Mortgage Loan Seller is the sole insured under such lender's title insurance policy, and such policy, binder or assurance is valid and remains in full force and effect, and each such policy, binder or assurance shall contain all applicable endorsements including a negative amortization endorsement, if applicable . . .

(xix) the information set forth in Schedule A of the Prospectus Supplement with respect to the Mortgage Loans is true and correct in all material respects;

(xx) no Mortgage Loan (a) is a "high cost loan" or "covered loan" as applicable (as such terms are defined in the version of Standard & Poor's LEVELS(R) Glossary in effect as of the date hereof, Appendix E, attached hereto as Exhibit 6) or (b) was originated on or after October 1, 2002 through March 6, 2003 and is governed by the Georgia Fair Lending Act . . .

(xxiii) the related Mortgage File contains each of the documents and instruments listed in Section 2.01 of the Pooling and Servicing Agreement, subject to any exceptions, substitutions and qualifications as are set forth in such Section;

(xxiv) the Mortgage Loans are currently being serviced in accordance with accepted servicing practices . . .

*Id*.

59.   As noted above in Section II(B), Citibank had an obligation to provide notice of breaches of these representations and warranties and such notice triggered EMC's

obligation to repurchase or substitute the defective loan.

60.     If Citibank had provided notice of the widespread representation and warranty violations, EMC would have been forced to repurchase the affected loans.

          **1.     Citibank Obtained Information During Its
               Administration of RMBS Trusts Alerting It
               to Widespread Breaches of Representations and Warranties**

61.     Through its role as trustee, Citibank knew or should have known that the Sponsor and Originator regularly disregarded their underwriting guidelines and representations and warranties made to securitization trusts long before certificateholders learned of such problems.

62.     Citibank served as trustee of numerous RMBS trusts from 2004–2007, including transactions involving the Sponsor and Originator.  In the course of administering these trusts, Citibank learned that the Sponsor and Originator had departed from their underwriting guidelines, engaged in predatory lending and failed to ensure that mortgage loans complied with state and federal laws.

63.     For example, while serving as trustee for various RMBS trusts, Citibank was presented with a large number of defaulted loans that were originated by the Sponsor and Originator here and foreclosures were often commenced in Citibank's name.  As shown below, over 50 percent of the loans in the Covered Trust defaulted within 18 months.  While a default alone does not demonstrate a breach of representation and warranty, Citibank, unlike certificateholders, was a party to foreclosure actions.  Through its review of these filings, Citibank knew or should have known that the borrowers either (i) did not qualify for the loans because they did not have the ability to repay the loans; (ii) were victims of predatory lending; or (iii) were given a loan that did not comply with state or federal law.

64.     Foreclosure actions were commenced in Citibank's name for numerous loans

(including loans in the Covered Trust) in which the origination practices were at issue.  *See, e.g.,*
*Citibank, N.A., as trustee for Structured Asset Mortgage Investments II Trust 2007-AR6*
*Mortgage Pass Through Certificates Series 2007-AR6 v. Ferrari*, No. 810113/12 (N.Y. Sup. Ct.
2012).

65.     For many of the loans in the Covered Trust, defaults and foreclosures occurred
just months after the loan was originated or securitized.  In each foreclosure, Citibank had a
contractual duty to execute necessary foreclosure filings, *see* PSA § 3.01, and had a general
duty to examine foreclosure filings because the servicer filed actions in the name of
Citibank and was acting on behalf of Citibank.  Having lent its name to the foreclosure
proceedings, Citibank had a duty to review and approve filings and therefore should have
learned about the problems with the mortgage loans revealed by those proceedings.

66.     Additionally, based on information and belief, Citibank's interaction with
monoline insurers in the course of administering its trusteeship duties likely would have added to
its knowledge of issues with EMC loans.

67.     Monoline insurance is a form of credit enhancement that involves purchasing
insurance to cover losses from any defaults.  Many RMBS trusts were insured by monoline
insurers.  The sponsors of the mortgage loans made representations and warranties concerning
the underwriting standards of the loans in the governing agreements for the insured RMBS.  The
governing agreements for the insured RMBS transactions have a repurchase procedure through
which the monoline insurers must provide notice of a breach of representation and warranty to
the responsible mortgage loan sponsor and the parties to the agreement, including the trustee.

68.     Monoline insurers, such as Ambac, have filed complaints against the Sponsor for
breaches of its mortgage loan representations and warranties in connection with other RMBS

trusts where Citibank acted as trustee.

69.    Prior to filing suit against the mortgage loan sponsors, the monoline insurers were often able to obtain and carry out a forensic loan level review of the loans at issue and often informed the trustee of those results.

70.    Pursuant to typical agreements governing the relevant insured RMBS transactions, monoline insurers, such as Ambac, would have provided Citibank with notice of breaches of representations and warranties for specific mortgage loans in trusts for which Citibank was trustee prior to filing lawsuits.

### 2.    Citibank Was Aware of Rating Downgrades and High Level of Defaults

71.    Apart from the notices, there were various other indications that should have caused Citibank to investigate whether the Covered Trust's loan pools included mortgage loans that materially breached the Sponsor's representations and warranties.  For example, the Sponsor's and Originator's pervasive abandonment of underwriting guidelines has had a devastating effect on the performance of the Covered Trust.  The Certificate acquired by Plaintiff was triple-A rated at the time of purchase.  Subsequently it was downgraded to a "junk" bond that did not qualify for any investment grade rating.  For example, Moody's downgraded it to "junk" status on February 23, 2009 and it currently has a rating of C.

72.    These downgrades were prompted by the alarming rate of defaults and delinquencies of the mortgage loans backing the Covered Trust.  In addition to the other information that Citibank was aware of due to its position as trustee set forth herein, Citibank was aware of the high level of defaults and should have carefully investigated these issues, notified certificateholders, including Plaintiff, of the issues, and taken action to address these issues.

23

73.     A loan that defaults shortly after origination can be an indicator that it was not underwritten in accordance with underwriting guidelines.  An analysis of the early payment default ("EPD") rates for loans underlying the Covered Trust, data available to the trustee, shows strong evidence that the loans were not underwritten in accordance with underwriting guidelines as half of the loans defaulted within 18 months.  The results are shown below:

| Defaults Occurring Within the First 18 Months | | | |
|---|---|---|---|
| Security | 6 Months | 12 Months | 18 Months |
| SAMI 2007-AR6 | 20.3% | 36.5% | 50.3% |

### 3.     Citibank Was or Should Have Been Aware of the Originator's and Sponsor's Pervasive Breaches

74.     As a result of its role as trustee, Citibank had knowledge of specific problems with specific loans as well as access to the mortgage loan files.  At a minimum, in its role as trustee to numerous RMBS trusts, Citibank was privy to information that would have provided the scent of a problem with the loans underlying the Covered Trust.  Having caught wind of the problem, Citibank had contractual and statutory duties requiring it to nose to the source.

75.     Citibank was aware or should have been aware of reports, investigations, and lawsuits concerning the Sponsor, EMC Mortgage Corporation, and Originator, American Home Mortgage Corporation ("AHM"), for the Covered Trust.  These reports would have raised the suspicions of a prudent trustee, causing it to act particularly in light of the fact that Citibank was aware of skyrocketing defaults, early payment defaults, and received information concerning the Sponsor and Originator.  Citibank failed to respond to these red flags.

76.     For example, AHM filed for bankruptcy on or around August 6, 2007. Citibank filed approximately nine claims in the AHM bankruptcy seeking recovery for breaches of the mortgage loan representation and warranties and EPDs in connection with securitized AHM mortgage loans, but not with respect to the Covered Trust.  According to a schedule in the bankruptcy proceedings, the aggregate estimation for breach of representation and warranty and EPD claims by all claimants (including Citibank) was over $270,000,000.  Because EMC has the obligation to repurchase the AHM loans in connection with the Covered Trust (as opposed to AHM), Citibank could not have filed (and did not file) a proof of claim in connection with the AHM loans in the Covered Trust.  However, Citibank's active participation and submission of claims in the AHM bankruptcy made clear that it was aware of breaches of representations and warranties in connection with AHM mortgages.

77.     Armed with this information concerning breaches of mortgage loan representations and warranties in connection with AHM loans and knowing that over 50 percent of the AHM mortgages in the Covered Trust defaulted within 18 months, Citibank should have taken similar actions to protect the certificateholders of the Covered Trust and enforce repurchase obligations against EMC.  Nevertheless, based on information and belief, Citibank did not exercise the right to "put back" the AHM loans to EMC.

78.     Unlike certificateholders, such as Plaintiff, Citibank had the ability to look beyond this public information because, based on information and belief, it received notice of mortgage loan re-underwriting findings from monoline insurers.  Citibank had the ability to request the mortgage loan files for the loans in the Covered Trust and independently review them.

25

### 4. If Citibank Had Performed Its Duties, It Would Have Obtained Further Evidence of Breaches of Representations and Warranties

79.     If Citibank did nose to the source of the information it learned concerning widespread breaches of representations and warranties in connection with AHM mortgages, Citibank would have readily identified further evidence of specific breaches of the mortgage loan representations and warranties.

80.     Based on an analysis of a random sample of loans in the Covered Trust that eventually became possible to conduct when adequate tools were introduced to the marketplace, FDIC-R identified numerous breaches of mortgage loans representations and warranties that FDIC-R was able to test without access to mortgage loan files.

81.     For example, while the mortgage loan representations and warranties provided that none of the mortgage loans in the Covered Trust were permitted to have a loan-to-value ("LTV") ratio over 100 percent, FDIC-R's analysis showed that 136 loans (or 54.4 percent of the sample loans) contained LTV ratios over 100 percent:[5]

| Results of LTV Analysis for Sample Loans for Citi Trust | | | |
|---|---|---|---|
| Security | No. of properties with adequate data to determine TMV | Loans with LTVs >100% per Pro-Supp | Loans with LTVs >100% per AVM |
| SAMI 2007-AR6 | 250 | 0 | 136 |

82.     The mortgage loan representations and warranties incorporated in the PSA, upon information and belief, also provided (as would be typical) that the mortgage loans would comply with the mortgage loan characteristics, including owner occupancy, reported

---

[5] Using a comprehensive, industry-standard automated valuation model ("AVM"), it was possible to determine the "true market value" of a certain property as of a specified date and thereby test whether any of the LTV ratios for the sample loans were over 100%.

in the prospectus supplements.  The investigation tested the accuracy of the representation

that loans were owner-occupied by examining indicia that the properties were not primary

residences, such as a borrower's bill being sent to a different address, a borrower not

designating property as a homestead, or a borrower's tax bills not being sent to the property

address.  Based on this analysis, the number of owner occupancy breaches in the sampled

loans was 38.2 percent as shown below.

| Results of Owner-Occupancy Analysis for Sample Loans for Citi Trust | | | | | | |
|---|---|---|---|---|---|---|
| Certificate | Properties Represented To Be Owner-Occupied | Bills Sent to Different Address | Property Not Designated as Homestead | Tax Bills Not Sent to Property Address | Sample Loans with At Least One Problem Noted in Prior 3 Columns | Percent Indicated To Have Incorrect Occupancy Designation |
| SAMI 2007-AR6 | 317 | 71 | 53 | 33 | 121 | 38.20% |

83.     Given that Citibank had access to the actual mortgage loan files, Citibank

could have evaluated compliance with the full set of the mortgage loan representations and

warranties incorporated in the PSA, which likely would have revealed far more breaches of

the mortgage loan representations and warranties.

### C.      Citibank Failed to Act Prudently to Enforce Repurchase Obligations

84.     Events of Default occurred under the PSA, but Citibank failed to take the

required actions to protect the rights of the certificateholders.

85.     First, as set forth in Section III(B), Citibank was aware (or would have been

aware if it had carried out its duties) that the parties to the PSA (including Citibank itself)

failed to provide notice of the representation and warranty violations that occurred in the

27

Covered Trust.  This failure itself was a default under the PSA for which Citibank was required to provide notice, triggering an Event of Default to the extent that the defaults were left unremedied.  Given that Citibank cannot avoid the occurrence of an Event of Default by shirking its duty to fulfill the condition precedent and provide notice under the PSA, these defaults all ripened into Events of Default.  As a result, Citibank had the duty to prudently exercise all available remedies, including the enforcement of the repurchase provisions in the PSA.

86.   Additionally, when Citibank learned that the servicers failed to provide notice of numerous breaches of representation and warranty provisions as required under the PSA, Citibank should have (i) taken action against the servicers; (ii) taken steps to require the Sponsor to repurchase or substitute the loans; and (iii) notified certificateholders of the defaults and the breaches of representation and warranty provisions.

87.   As described below, additional Events of Default occurred under the terms of the PSA.

### 1.    Events of Default Relating to Document Delivery

88.   Events of Default occurred shortly after the closing of the RMBS transactions relating to the Covered Trust, because servicers breached their obligation to cause the responsible parties to repurchase or substitute for loans with document exceptions that were not cured within the required period.  These Events of Default triggered Citibank's duty to act prudently to protect the interests of certificateholders in all respects, which duty continued during the period that Plaintiff held the Certificates.

89.   The Master Servicer's failure to cause the repurchase or substitution of loans with document exceptions also constituted a breach of their prudent servicing obligations.

28

Section 8.01 of the PSA provides that the Servicer's or Master Servicer's failure to adhere to prudent servicing standards ripens into an Event of Default if left uncured within a specified period of notice by the Trustee of such breach.  Rather than taking a loss on loans that were eligible for repurchase, a prudent servicer would have caused a responsible party to repurchase them.  Instead, the servicers liquidated loans with document exceptions. Citibank was aware of this fact as it was aware of the contents of the document exception reports and that properties with exceptions had defaulted and not been repurchased or substituted.  However, Citibank did not provide notice as it was required to do.  Having failed to provide the required notice, Citibank had an obligation to act prudently to address all defaults.

90.    Despite the existence of uncured Events of Default, Citibank did not adequately address the defaults and Events of Default.  If Citibank had acted prudently, it would have exercised remedies to address the document delivery failures and numerous breaches of representations and warranties by the Sponsor and caused it to repurchase or substitute the affected loans.  Citibank's failure to do so continued during the period that Plaintiff held the Certificate and damaged Plaintiff.

### 2.    Events of Default Concerning False Master Servicer and Servicer Certifications

91.    The PSA obligated the Master Servicer to certify annually that it met its obligations under the PSA and applicable federal regulations.  Section 3.16 of the PSA requires the Master Servicer to certify, among other things, that:

(i)    a review of the activities of each such party during the preceding calendar year and of its performance under this Agreement has been made under such officer's supervision and

(ii)    to the best of such officer's knowledge, based on such

> review, such party has fulfilled all of its obligations under this
> Agreement in all material respects throughout such year, or, if there
> has been a failure to fulfill any such obligation in any material
> respect, specifying each such failure known to such officer and the
> nature and status of the cure provisions thereof.

92.     The failure to provide a conforming certification is an Event of Default under

the PSA.  *See* PSA § 8.01.  Citibank received certifications that it knew to be false because

the servicers were not in fact meeting their obligations under the PSA.  As discussed above,

the servicers breached the PSA in many ways, including by attempting to foreclose on

defective loans rather than tendering loans for repurchase or substitution and overcharging

borrowers for default services (the costs of which were ultimately taken from the Covered

Trust).  Citibank was aware of or should have been aware of these breaches and therefore

knew the required servicer certifications did not conform because they were false.  Events of

Default were triggered as a result and Citibank had a continuing duty to act prudently to

protect the certificateholders' interests.

93.     In addition, under the Covered Trust's PSA, the servicers provide a

representation and warranty and/or covenant that all reports provided under the PSA,

including servicing compliance certifications, were accurate and complete.  Section 2.07 (ii)

of the PSA provides: "[N]o written information, certificate of an officer, statement furnished in

writing or written report prepared by the Master Servicer pursuant to this Agreement and

delivered to the Securities Administrator, the depositor, any Affiliate of the depositor or the

Trustee will contain any untrue statement of a material fact or omit to state a material fact

necessary to make the information, certificate, statement or report not misleading."

94.     As addressed above, Citibank had a duty to provide notice of breaches of

representations and warranties or covenants resulting from the servicers' false certifications, but

failed to do so despite being aware of them. Because Citibank cannot avoid the duty to act prudently by failing to give notice of a default, these breaches ripened into Events of Default triggering Citibank's continuing duty to act prudently to protect the certificateholders' interests.

> **D.    Citibank Failed to Address the Master
> Servicer's and Servicer's Excessive Charges
> for Default Services that Diminished Trust Assets**

95.    In addition to the servicing related defaults and Events of Default described above, the Servicer, EMC Mortgage Corporation, and Master Servicer, Wells Fargo Bank, have engaged in a variety of practices that resulted in overcharging defaulted borrowers that Citibank failed to address. These practices have increased loss severities on defaulted mortgages and, as a result, increased Plaintiff's losses.

96.    As an initial matter, to the extent that the PSA permitted modifications, upon information and belief, the Master Servicer and Servicer did not modify loans when it was in the Covered Trust's interest to do so rather than foreclose.

97.    It has been widely reported that the Master Servicer and Servicer have overcharged borrowers after default by, *inter alia*, charging improper and excessive fees (including without limitation fees for property maintenance prior to foreclosure), failing to properly oversee third-party vendors and procuring insurance policies for properties that were already insured. As a result, the Master Servicer and Servicer received excess fees from borrowers (and ultimately the Covered Trust) for default-related services.

98.    Improper foreclosure practices, like foreclosing without the required documents, have been the subject of many government investigations and settlements, including, for example, a $25 billion settlement where Wells Fargo (along with four other

banks including Citibank itself) acknowledged such improper practices.[6]

99.     These excessive and often unnecessary fees were ultimately paid by certificateholders because when a defaulting borrower's home is foreclosed upon and sold, the servicers deduct their fees (which defaulting borrowers are in no position to pay themselves) and any servicing advances from sale proceeds before any funds are transferred to the securitization trust that purportedly owned the mortgage loan and thus was entitled to the net sale proceeds.

100.     These overcharges are improper and resulted in breaches under the PSA because they do not meet the prudent servicing standard.  As noted in Sections II(E) and III(C), servicing related defaults known to Citibank triggered its duty to act prudently. Citibank was or should have been aware of allegations of these widespread servicing abuses, including because, among other reasons, it was a party to the $25 billion settlement set forth above.  Upon information and belief, if Citibank had investigated, it would have discovered that serious serving abuses impacted the loans in the Covered Trust.

## IV.    CITIBANK'S CONDUCT INJURED PLAINTIFF

101.     By March 2010 it was apparent that Citibank failed to act in the interests of certificateholders.  RMBS market participants were aware of this fact by March 2010 as reflected in market publications.  As an example, in a white paper issued in March 2010 titled *Reforming the Asset-Backed Securities Market*, the American Association of Mortgage Investors (consisting of many RMBS investors) observed:

> Right now, trustees of collateral pools play a largely passive role and bear little if any accountability to the holders of securities which they

---

[6] Department of Justice Press Release, *Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses*, Feb. 9, 2012, *available at* http://www.justice.gov/opa/pr/federal-government-and-state-attorneys-general-reach-25-billion-agreement-five-largest.

have agreed – and are being compensated – to serve.  In practice they do not supervise the servicers of collateral pools, who are often affiliated with the loan originators and therefore have strong incentives not to enforce representation and warranty claims on behalf of investors.

102.    The white paper further reflected this market understanding when it went on to state:

If one considers that the trustee of a securitization is like the board of directors of a company and the servicer of a collateral pool is functionally like the management, then it must be stated that holders of asset-backed securities are not given the protective rights, relative to those expected to serve them, that shareholders are provided. Securitization legal structures may utilize trustees and holders of asset-backed securities may have their rights shaped by contracts, but these holders are collectively the equity of the trust and they are owed fiduciary duties which must be respected. At least shareholders have the right to find out who their fellow security holders are, the right to an annual meeting, and the right to remove and elect new directors. Holders of asset-backed securities have none of these rights.

103.    Because the market had concluded that defaulted loans would result in significant principal write-downs for the Certificate, market values for the Certificate were well below par in March 2010.  The trading price as a percentage for SAMI 2007-AR6 1A2 was merely 13.3 percent of the current face value as of March 2010.

104.    On March 11, 2010, Plaintiff sold the Certificate as part of a resecuritization transaction, SSGN 2010-S1, and suffered over $200 million in losses.  The sale was made pursuant to a Trust Agreement by and among the Federal Deposit Insurance Corporation as Receiver for the Depository Institutions, Wilmington Trust Company, and Citbank N.A. dated March 11, 2010 (the "Trust Agreement").   The Trust Agreement has an express Delaware choice of law provision.

105.    Section 3.01 of the Trust Agreement provides that the Seller (*i.e.*, the Receivership) conveys "all its right, title and interest in and to the Underlying Securities,

including all interest and principal due on or with respect to the Underlying Securities." This language is substantially similar to the language of Article 8 of the UCC, which under Delaware law, does not result in a conveyance of claims accruing prior to the sale held by the seller.

106.    If Citibank had performed its duties as trustee, it would have enforced the obligations of the Sponsor and caused it to buy back, or replace with non-defective loans, the vast majority, if not all, of the loans that ultimately defaulted and caused Plaintiff's losses.

107.    Citibank's failure to address the servicers' failure to adhere to prudent servicing practices also increased the loss severities (*i.e.*, the amount of principal loss caused by defaults) on defaulted loans dramatically.  The extended foreclosure timelines that resulted from document delivery failures resulted in increased servicing fees, property tax, and utility expenditures that were borne by the Covered Trust, a decline in value of the underlying properties, and ultimately less sale proceeds for the Covered Trust and certificateholders.  The overcharging for default-related services and forced-placed insurance further increased loss severities as those overcharges were collected by the servicers from foreclosure sale proceeds.

108.    If Citibank had met its contractual and statutory duties to accept delivery of notes and mortgage loans files, inspect them, give notice as required and issue accurate certifications, it would have caused the Sponsor to substitute or repurchase all loans where the required documentation was missing or where there were breaches of representations and warranties regarding the mortgage loans.  This would have included numerous loans that had already defaulted or would ultimately default.

109.    Citibank's failure to meet its contractual and statutory duties once it became aware of defaults relating to the numerous representation and warranty breaches further caused harm.  If Citibank had provided notice of representation and warranty violations and defaults and

acted prudently as it was required to do upon the occurrence of a default or Event of Default, it would have caused the Sponsor to repurchase loans as it was required to do and, required the servicers to pay the damages to the Covered Trust caused by their improper servicing practices.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### (Breach of Contract)

110.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

111.     The PSA is a valid and binding contract entered into between Citibank, the the Sponsor, the Master Servicer and Securities Administrator, and depositor.

112.     The PSA provides, among other things, the terms under which Citibank acts as Trustee for the Covered Trust.

113.     As a former holder of a Certificate issued by the Covered Trust, Plaintiff is an express, intended third party beneficiary under the PSA entitled to enforce the performance of the Trustee.

114.     Citibank breached several obligations that it undertook on behalf of Plaintiff as a certificateholder including, without limitation, to:

    (a)     take physical possession of the operative documents for the mortgage loans in the Covered Trust;

    (b)     identify those mortgage loans for which there was missing, defective, or incomplete documentation on the "Document Exception Report" attached to the "Final Certification of the Trustee";

    (c)     make accurate representations in the "Initial Mortgage Certification," the "Final Certification of the Trustee," and all schedules and attachments thereto;

    (d)     protect the interests of the beneficiaries of the Covered Trust;

      (e)      take steps to cause the Sponsor to repurchase loans lacking adequate documentation;

      (f)      investigate and give notice to all parties to the PSA of the breaches of representations and warranties relating to the mortgage loans once it discovered the Sponsor's and Originator's widespread practice of including in securitization trusts loans which breached such representations and warranties;

      (g)      make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

      (h)      provide notice of, and take steps to remedy, the servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSA; and

      (i)      enforce the repurchase obligations of the Sponsor.

115.    The specific provisions breached by Citibank are further detailed herein.

116.    Citibank's breach of its duties set forth in the PSA, as described above, directly and proximately caused Plaintiff to incur losses on its Certificate and diminished its value.

117.    Plaintiff has performed its obligations under the PSA.

118.    Citibank is liable to Plaintiff for the losses it suffered as a direct result of Citibank's failure to perform its contractual obligations under the PSA.

## SECOND CAUSE OF ACTION
### (Violation of the Streit Act)

119.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

120.    As a certificateholder, Plaintiff is a trust beneficiary entitled to the protections afforded under the Streit Act.  The Streit Act was enacted to provide for the proper administration of mortgage trusts and requires that the trustee must exercise due care in

36

performing its obligations.  N.Y. Real Prop. Law § 124.

121.    The Certificate is a "mortgage investment" subject to the Streit Act.  N.Y. Real Prop. Law § 125(1).  Citibank conducted business with respect to the mortgage investments in New York and many properties underlying the certificates are located in New York.

122.    The PSA underlying and establishing the Covered Trust is an "indenture," and Citibank is a "trustee," under the Streit Act.  N.Y. Real Prop. Law § 125(3).

123.    Prior to any Event of Default, as described above, Citibank violated the Streit Act by failing to perform its pre-default obligations with due care.  Further, Events of Default occurred under the Covered Trust shortly after closing.

124.    Section 126(1) of the Streit Act provides that upon an event of default the indenture trustee must exercise such of the rights and powers vested in it by the indenture and must use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

125.    The Streit Act further imposes a duty upon trustees of mortgage trusts to discharge their duties under the applicable indenture with due care in order to ensure the orderly administration of the trust and protect trust beneficiary rights.

126.    As set forth above, Citibank failed to exercise its rights under the PSA after becoming aware of defaults and Events of Default by failing to:

> (a)    take physical possession of the operative documents for the mortgage loans in the Covered Trust;
>
> (b)    identify those mortgage loans for which there was missing, defective, or incomplete documentation on the "Document Exception Report" attached to the "Final Certification of the Trustee";
>
> (c)    make accurate representations in the "Initial Mortgage Certification,"

37

the "Final Certification of the Trustee," and all schedules and attachments thereto;

(d)     protect the interests of the beneficiaries of the Covered Trust;

(e)     take steps to cause the Sponsor to repurchase loans lacking adequate documentation;

(f)     investigate and give notice to all parties to the PSA of the breaches of representations and warranties relating to the mortgage loans once it discovered the Sponsor's and Originator's widespread practice of including in securitization trusts loans which breached such representations and warranties;

(g)     make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

(h)     provide notice of, and take steps to remedy, the servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSA; and

(i)     enforce the repurchase obligations of the Sponsor.

127.     Citibank is liable to Plaintiff for damages incurred as a direct and proximate result of its violation of the Streit Act.

### THIRD CAUSE OF ACTION
#### (Violations of the TIA)[7]

128.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

129.     The PSA underlying and establishing the Covered Trust is an "indenture," and Citibank is an "indenture trustee," under the TIA.  15 U.S.C. § 77aaa(7), (10).

130.     As a certificateholder, Plaintiff was a trust beneficiary entitled to the protections afforded under the TIA.

131.     The TIA applies to the PSA and the related Certificate. 15 U.S.C.

---

[7] As set forth above, Plaintiff includes a TIA claim for purposes of preserving any rights on appeal.

§ 77ddd(a)(1).

132.    Citibank violated the TIA in at least four ways.  First, TIA Section 315(a) provides that, prior to default (as that term is defined in the indenture), the trustee is liable for any duties specifically set out in the indenture.  15 U.S.C. § 77ooo(a)(1).  As set forth above, Citibank failed to comply with a number of duties set out in the indentures, including its duties to carefully review the mortgage files, to notify certificateholders and other parties of deficiencies, to provide notice of defaults or Events of Default relating to servicing of the loans, to take steps to address those deficiencies, and, most importantly, to enforce the substitution or repurchase of defective loans.

133.    Second, TIA Section 315(b) provides that the indenture trustee must notify certificateholders of "all defaults known to the trustee, within ninety days after the occurrence thereof."  15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)).  As set forth above, Citibank failed to carefully investigate serious known issues with the loans in the trusts, or to notify certificateholders of numerous defaults, including the failure of the responsible parties to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of representations and warranties.

134.    Third, in the case of defaults (as that term is defined in the indenture), the TIA requires that the trustee exercise its rights and powers under the governing agreement as a "prudent man would exercise or use [them] under the circumstances in the conduct of his own affairs."  15 U.S.C. § 77ooo(c).  Here, as set forth above, Citibank did not act prudently after learning of numerous serious issues related to material breaches of representations and warranties and servicer defaults and Events of Default.  A prudent person would have taken action to investigate these issues carefully, pursue repurchase remedies, and cure defective

mortgage loans.  In addition, a prudent person would have taken action against the responsible parties for the failure to properly execute and deliver mortgage file documents.

135.    Finally, the TIA states that "[n]otwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security . . . shall not be impaired or affected without the consent of such holder." 15 U.S.C. § 77ppp(b).  Citibank has impaired the ability of the Covered Trust, and consequently the certificateholders, to receive payment in connection with defective mortgage loans for which Citibank failed to take action to correct.  In addition, Citibank has impaired the ability of the Covered Trust, and consequently the certificateholders, to receive payment by failing to enforce the repurchase remedy.

136.    These breaches materially and adversely affected the interests of the certificateholders, including Plaintiff, because they resulted in the trusts being burdened with large numbers of defective loans that should have been put back to the Sponsor.

137.    Citibank is liable to Plaintiff for damages incurred as a direct and proximate result of its violations of the TIA in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.      Awarding compensatory damages and/or equitable relief in favor of Plaintiff against Citibank for breaches of its statutory and contractual duties, in an amount to be proven at trial, including interest thereon;

B.      Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

40

C.      Such other relief as the Court may deem just and proper.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury on all issues triable by jury.


Dated:  August 19, 2015


By: <u>    /s/ *David H. Wollmuth*       </u>

                David H. Wollmuth
                Steven S. Fitzgerald
                Ryan A. Kane
                Robert T. Franciscovich
                WOLLMUTH MAHER & DEUTSCH LLP
                500 Fifth Avenue
                New York, New York 10110
                Phone: (212) 382-3300
                Fax: (212) 382-0050
                dwollmuth@wmd-law.com
                sfitzgerald@wmd-law.com
                rkane@wmd-law.com
                rfranciscovich@wmd-law.com

                *Attorneys for Plaintiff*